**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| Plaintiff, ) | Case No.   2:07-cr-00277-RLH-GWF |
| ) | |
| vs. ) | **FINDINGS & RECOMMENDATIONS** |
| ) | |
| SANTIAGO HERNANDEZ-GOMEZ, ) | |
| ) | |
| Defendant. ) | |

This matter is before the Court on Defendant Santiago Hernandez-Gomez's Motion to Suppress Evidence (#18), filed on February 14, 2008 and the Government's Response to Defendant's Motion to Suppress Evidence (#20), filed on February 25, 2008. The Court conducted an evidentiary hearing on March 13, 2008.

Defendant Hernandez-Gomez was indicted on October 31, 2007 for violation of Title 8 of the United States Code Section 1326 - Deported Alien Found Unlawfully in the United States. *Criminal Indictment (#1).* This indictment followed Defendant's arrest on October 7, 2007 by the Las Vegas Metropolitan Police Department for operating a motor vehicle while under the influence of intoxicating liquor ("DUI") in violation of NRS 484.379. Defendant does not dispute that the police officer had a lawful basis to stop him for speeding. Defendant contends, however, that the police officer lacked reasonable suspicion and/or probable cause to believe that he was under the influence of alcohol and therefore his arrest on that charge violated the Fourth Amendment. Because Defendant's DUI arrest led to his identification as an allegedly deported alien and his subsequent indictment in this case, Defendant requests that the Court suppress any and all evidence derived from the unconstitutional seizure, including evidence of Defendant's identity, fingerprints, statements, his purported immigration file, and all observations of his presence in the United States.

1    **FACTUAL BACKGROUND**

2          The sole witness to testify at the evidentiary hearing was Las Vegas Metropolitan Police

3    Department ("Metro") officer Joel Cranford.  Officer Cranford testified that he has been employed by

4    Metro since 2002.  Prior to that, he was employed as a police officer in Winston-Salem, North Carolina

5    from 1996 to 2002.  Officer Cranford  attended the police academies for both the Winston-Salem police

6    department and Metro.  He testified that both academies provided instruction for investigating DUI

7    cases.  He also took the forty (40) hour National Highway Traffic Safety Administration ("NHTSA")

8    certification course for investigating DUI, which included training in performing the standard field

9    sobriety tests.  Officer Cranford took the NHTSA certification course in approximately 1998.  He has

10   not been "re-certified" by NHTSA since that time.  For the past three years, Officer Cranford has been

11   assigned to Metro's Traffic Bureau as a motorcycle traffic officer.  He testified that during the past three

12   years he has handled approximately 300-400 DUI arrests.

13         On October 7, 2007 at approximately 6:00 a.m., Officer Cranford was on patrol in the area of

14   Sunset Road and Bermuda Street in Clark County, Nevada.  At that time he was parked on his

15   motorcycle on Bermuda Street and was observing traffic on Sunset Road which has a 45 mph speed

16   limit.  Officer Cranford observed a black "SUV" vehicle traveling toward him on eastbound Sunset

17   Road.  He visually estimated the speed of the vehicle at 60 mph.  He activated his radar unit which

18   recorded the speed of the vehicle at 63 mph.  Officer Cranford pulled behind the vehicle and

19   illuminated the emergency lights and siren on his motorcycle.  The vehicle traveled approximately 1/2

20   mile down the roadway before pulling over in response to Officer Cranford's emergency lights and

21   siren.

22         Officer Cranford testified that he stopped the vehicle at 6:05 a.m.   He stated that it was about

23   dawn at that time of morning and there was sufficient natural lighting for him to observe the driver

24   without the use of his flashlight.[1]  Officer Cranford approached the driver's side window of the vehicle

25   and asked the driver, Defendant Hernandez-Gomez, for his driver's license, vehicle registration and

26   proof of insurance.  He asked Defendant where he was coming from and Defendant responded that he

27   _____

28         [1]Sunrise on October 7, 2007 was 6:41 a.m. *See http://timeanddate.com/world clock.*

1   had been at the "Pacquio-Barrerra" boxing match.  Officer Cranford testified that he was aware that this
2   boxing match had occurred the evening before at approximately 8:00 or 9:00 p.m.  He asked Defendant
3   what he had been doing since the boxing match and Defendant responded that he had been hanging out
4   on the Las Vegas Strip.  Officer Cranford testified he observed an odor of alcohol emanating from the
5   Defendant and also observed that his eyes were blood shot.  Defendant's speech was also slow.   Officer
6   Cranford asked Defendant if he had been drinking and Defendant responded that he had drank two or
7   three beers.

8          Based on these observations, Officer Cranford suspected that Defendant was under the influence
9   of alcohol and, therefore, decided to perform a field sobriety test.  Officer Cranford asked Defendant to
10  step out of his vehicle and Defendant complied.  Officer Cranford requested that Defendant submit to a
11  field sobriety test.  Defendant agreed to perform the test.[2]  Officer Cranford also testified that he asked
12  Defendant if he had any impairment that would prevent him from performing the test and Defendant
13  said no.  Officer Cranford testified that there are three parts to the standard field sobriety test: the walk
14  and turn test, the one leg stand test and the horizontal gaze nystagmus ("HGN" ) test. Officer Cranford
15  first  conducted the "HGN"  test.  He testified that he bases about 80 percent of the field sobriety tests
16  on the results of the HGN test which he considers to be more objective than the other parts of the test.
17  Under cross-examination by Defendant's counsel, Officer Cranford described the performance of the
18  HGN test.  He testified that he placed his finger in front of Defendant's eyes and instructed him to
19  follow his finger with his eyes.  Officer Cranford moved his finger out to the farthest point of
20  Defendant's peripheral vision, or approximately 90 degrees.  He testified that nystagmus is the
21  "bouncing" of the eyeball as it follows the stylus, in this case the officer's finger.   Officer Cranford
22  testified that in performing the HGN test, he was trained to look for the onset of nystagmus prior to 45
23  degrees, distinct nystagmus as maximum deviation (90 degrees) and the lack of smooth pursuit.  Officer
24  Cranford testified Defendant's eyes did not pursue smoothly, there was distinct nystagmus at maximum
25  deviation, 90 degrees, and there was onset of nystagmus before 45 degrees.  Officer Cranford testified

26

27          [2]Officer Cranford acknowledged that Defendant would not have been free to leave if he had
28  refused to perform the test.

1   that he concluded that there was probable cause to believe that Defendant was impaired by alcohol

2   based on the HGN test and because Defendant had an odor of alcoholic beverage.

3          After completing the HGN test, Officer Cranford asked Defendant to perform the two other

4   segments of the field sobriety test, the walk and turn test and the one leg stand test.  Officer Cranford

5   testified that these two tests are more subjective than the HGN test, and he placed less reliance on them

6   in determining that Defendant was impaired.  He acknowledged that prior to performing these two parts

7   of the field sobriety test, he had already determined that Defendant was impaired.  Defendant was

8   unable to successfully perform either of these tests.  On the walk and turn test, Defendant stopped while

9   walking to steady himself, did not touch heal to toe and stepped off the line three or more times.  On the

10  one leg stand test, Defendant swayed while balancing, used his arms to balance and put his foot down

11  three or more times.  Officer Cranford acknowledged that Defendant was cooperative and appeared to

12  understand Officer Cranford's instructions.  Defendant's failures on the tests were not the result of his

13  inability to understand the officer, but rather his physical inability to perform the tests.  Officer

14  Cranford also acknowledged that an individual's ability or inability to understand and follow

15  instructions is an important factor in determining whether he is impaired.

16         Based on the field sobriety test, Officer Cranford believed that Defendant was impaired by

17  alcohol.  He therefore performed a preliminary breath test ("PBT") on Defendant by having him blow

18  into the PBT unit.  Officer Cranford testified that the PBT unit was previously calibrated.  He did not

19  produce any certifications at the hearing, however, to show that the PBT unit was properly calibrated at

20  the time he used it to test Defendant.  The results of this test indicated a blood alcohol level of .093

21  percent, above the .08 percent provided under Nevada law for the finding that the person is under the

22  influence of alcohol.  Officer Cranford placed Defendant under arrest at 6:15 a.m.   The total time of the

23  detention from when Defendant's vehicle was stopped till he was placed under arrest was 10 minutes.

24          After Defendant was arrested, law enforcement contacted Immigration and Customs

25  Enforcement ("ICE") and notified it of Defendant's arrest.  ICE subsequently lodged an immigration

26  detainer against Defendant and took him into custody on October 9, 2007.  *See Motion to Suppress*

27  *(#18),* page 2.  He was thereafter indicted in this case.

28  . . .

4

1

### DISCUSSION

2    Defendant's Motion to Suppress requires the Court to address two main issues.  The first issue

3    is whether Officer Cranford had reasonable suspicion that Defendant was under the influence of alcohol

4    to support conducting a field sobriety test and whether, after completing the field sobriety test and the

5    preliminary breath test, the officer had probable cause to arrest Defendant for DUI.  Assuming that

6    Defendant's DUI arrest violated the Fourth Amendment, the second issue is whether evidence relating

7    to his identity can be suppressed in this prosecution under 8 U.S.C. § 1326 pursuant to applicable

8    Supreme Court and Ninth Circuit case law.

9    **1.    Whether the Officer Had Probable Cause to Arrest Defendant for DUI.**

10    If a police officer has probable cause to believe that a traffic violation has occurred, he may

11    conduct a traffic stop.  *United States v. Choudhry*, 461 F.3d 1097, 1100  (9th Cir. 2006), citing *Whren v.*

12    *United States*, 517 U.S. 806, 819  116 S.Ct. 1769 (1996), *United States v. Willis*, 431 F.3d 709, 714-17

13    (9th Cir. 2005).  In this case, Officer Cranford had probable cause to stop Defendant's vehicle for

14    speeding based on his visual observation, confirmed by radar, that Defendant's vehicle was traveling in

15    excess of 60 mph in a 45 mph speed zone.  Defendant has not disputed the reasonableness of the initial

16    stop.

17    During a traffic stop, an officer may ask questions that are reasonably related in scope to the

18    justification for the initial stop.  An officer may expand the scope of his investigation and questioning

19    beyond the initial purpose of the stop if "he articulate[s] suspicious factors that are particularized and

20    objective" which support an expansion of the investigation into other areas.  *United States v. Mendez*,

21    476 F.3d 107, 1080 (9th Cir. 2007), *citing United States v. Murillo*, 255 F.3d 1169, 1174 (9th Cir. 2001);

22    *United States v. Chavez-Valenzuela*, 268 F.3d 719, 724 (9th Cir. 2001); *United States v. Perez*, 37 F.3d

23    510, 513 (9th Cir. 1994).  As *Mendez* notes, in *Muehler v. Mena*, 544 U.S. 93, 100-01, 125 S.Ct. 1465

24    (2005), the Supreme Court held that questioning outside the scope of the initial purpose of the stop does

25    not constitute a seizure unless it prolongs the detention.

26    Requiring a driver to submit to a field sobriety test constitutes a seizure within the meaning of

27    the Fourth Amendment.  Courts have generally held that the intrusion on the driver's liberty resulting

28    from a field sobriety test is minor, and the officer therefore need only have reasonable suspicion that the

1  driver is under the influence of alcohol in order to conduct a field sobriety test.  *See Vondrak v. City of*
2  *Las Cruces*, 2007 WL 3319449 (D.N.M. 2007) *8, citing Rogala v. Dist. of Columbia*, 161 F.3d 44, 52
3  (D.C. Cir. 1998).  *See also United States v. Kranz*, 177 F.Supp.2d 760 (S.D. Ohio 2001) and *United*
4  *States v. Caine,* 517 F.Supp.2d 586, 589-590 (D.Mass. 2007).  Like probable cause, reasonable
5  suspicion is based on the totality of the circumstances.  The level of proof, however, is less than that
6  required for probable cause.  *United States v. Sokolow*, 490 U.S. 1, 7, 109 S.Ct. 1581, 1585 (1989).

7          In *United States v. Kranz*, 177 F.Supp.2d 760 (S.D. Ohio 2001), the officer stopped defendant's
8  vehicle for speeding.  The defendant pulled over very promptly after the officer signaled him to stop,
9  but placed his vehicle in park before stopping, causing it to jerk and skid.  This action caused the officer
10  to begin to suspect that the defendant was under the influence.  Upon approaching the vehicle, the
11  officer observed an odor of alcoholic beverage, defendant's eyes were glassy and bloodshot, and his
12  speech was slurred.  Upon exiting the vehicle, the defendant's walk was unsure.  In holding that this
13  evidence was sufficient to justify the officer's request that defendant submit to a field sobriety test, the
14  court noted that it is the very nature of circumstantial evidence that one piece of it is seldom sufficient
15  for conviction.  Rather, it is the combination of pieces of evidence, each of which is individually
16  consistent with an innocent explanation, which may lead collectively to the eventual conclusion of guilt.
17  *Kranz*, 177 F.Supp.2d at 763.  The court noted, for example, that the fact that an individual has been
18  awake for many hours may explain his bloodshot or glassy eyes.  The odor of alcohol may also be
19  consistent with many innocent causes, including that defendant did not drink a quantity of alcoholic
20  beverage sufficient to impair his ability to operate a motor vehicle.  These observations, in combination
21  with others, however, may indicate alcohol impairment.  In *United States v. Stanton*, 501 F.3d 1093,
22  1100 (9th Cir. 2007), the court, in upholding defendant's DUI conviction, discussed the circumstantial
23  evidence that supported the conviction.  The court stated that "[a]lthough any of these factors - singly or
24  collectively - might be explained innocently 'the prosecution need not affirmatively rule out every
25  hypothesis except that of guilt.' (citation omitted)."

26          The question before the court in *Kranz,* as in this case, was not whether the officer's
27  observations were sufficient to convict or even arrest the driver for DUI, but whether they merited the
28  additional investigation and the consequent limitation on the driver's liberty required for the field

1  sobriety test.  In holding that the officer's observations were sufficient to provide reasonable suspicion

2  that defendant was under the influence of alcohol, *Kranz* noted that field sobriety tests do not involve a

3  major intrusion on liberty and that the intrusion imposed by field sobriety test is reasonable both from

4  the perspective of the driver and society as a whole.  *Kranz* also stated that field sobriety tests, properly

5  administered, are reliable indicators of alcohol impairment. *Id.*

6           In *United States v. Caine,* 517 F.Supp.2d 586, 589-590 (D.Mass. 2007), the officer stopped

7  defendant's vehicle after it ran a stop sign.  Upon approaching defendant's vehicle, the officer asked for

8  her driver's license and registration and observed that she had bloodshot and glassy eyes.  Defendant

9  admitted to the officer that she had been drinking earlier that night.  The officer then requested that

10  defendant exit her vehicle and undergo a field sobriety test.  The defendant failed the field sobriety test

11  and her preliminary breath test at the scene was 0.141.  In holding that the officer had reasonable

12  suspicion to believe that defendant was under the influence of alcohol, the court noted that although

13  bloodshot and glassy eyes could be the result of a number of innocent causes, it was also reasonable to

14  suspect that defendant's condition was caused by alcohol consumption, particularly after she admitted

15  drinking earlier in the night.  The court, therefore, held that the factual circumstances provided

16  reasonable suspicion to support the field sobriety test.  *Caine* also agreed with *Kranz* that the field

17  sobriety test does not involve a major intrusion on liberty and is reasonable from the perspective of the

18  driver and society.  *Id.*, at 589-590.  The court in *Vondrak, supra,* 2007 WL 2219449 *8 cites numerous

19  examples of circumstances in which courts have found that the officers had reasonable suspicion to

20  conduct field sobriety tests.  A fairly common factor in the cases is the officer's observation of the odor

21  of alcoholic beverages on the driver, which along with other factors supports a finding of reasonable

22  suspicion.

23           In this case, Officer Cranford stopped Defendant's vehicle for speeding.  Common experience

24  indicates that many sober drivers speed and Officer Cranford acknowledged that speeding, by itself,

25  does not indicate that a driver is impaired.  Officer Cranford also testified that Defendant's vehicle did

26  not stop for approximately 1/2 mile after the officer signaled him to do so.  This could be an indication

27  that the driver is not fully aware of his surroundings and may be impaired.  Upon approaching

28  Defendant's vehicle and asking him for his driver's license, registration and proof of insurance, Officer

1  Cranford testified that he smelled an odor of alcoholic beverage on the Defendant.  He also testified that

2  he observed that Defendant's eyes were bloodshot.  In response to Officer Cranford's question as to

3  where he was coming from, Defendant stated he was coming from a boxing match which had occurred

4  8-9 hours earlier.  In response to the officer's further question where he had been since the boxing

5  match ended, Defendant stated that he was hanging out on the Las Vegas Strip.  Defendant also stated

6  that he had drank two or three beers.

7      The Court has some doubt regarding Officer Cranford's ability to initially observe that

8  Defendant's eyes were bloodshot while Defendant was still seated in his vehicle.  Although Officer

9  Cranford testified that there was sufficient light for him to observe Defendant's face and eyes, the stop

10  occurred at least thirty minutes before sunrise.  Officer Cranford did not use his flashlight to illuminate

11  the Defendant's face or eyes.  This doubt notwithstanding, the Court finds that Officer Cranford had

12  reasonable suspicion that Defendant was under the influence of alcohol to justify performing the field

13  sobriety test.  The officer's observation of an odor of alcoholic beverage, combined with Defendant's

14  statement that he had been out all night and had been hanging out on the Las Vegas Strip, and had

15  drank two or three beers, together with the fact that he was speeding at least 15 mph over the speed

16  limit, and traveled an unusually long distance after being signaled to stop, are objective, articulable

17  circumstances that would give a police officer reasonable suspicion that the Defendant was under the

18  influence of alcohol to support conducting a field sobriety test.

19      Defendant also challenges whether Officer Cranford properly conducted the field sobriety tests

20  such that he had probable cause to arrest Defendant for DUI based on the results of those tests.  In this

21  regard, Defendant challenged whether Officer Cranford correctly performed the HGN test and whether

22  he took sufficient time to conduct all three parts of the field sobriety test.  The HGN test was developed

23  as part of the standard field sobriety test by the National Highway Traffic Safety Administration

24  ("NHTSA").  *See United States v. Horn*, 185 F.Supp.2d 530, 535-37 (D.Md. 2002).  In the HGN test

25  the driver is asked to focus his eyes on an object held by the officer at the driver's eye level.  As the

26  officer moves the object gradually out of the driver's field of vision toward his ear, he watches the

27  driver's eyeball to detect involuntary jerking (nystagmus).  *Horn* states that there is a well recognized,

28  but by no means exclusive, causal connection between the ingestion of alcohol and the detectable

8

1   presence of exaggerated horizontal gaze nystagmus in a person's eyes which may be judicially noticed

2   by the court.  As *Horn* noted, nystagmus will always be present in the human eye, but certain

3   conditions, including alcohol ingestion, can cause an exaggeration of nystagmus such that it is more

4   readily observable.  By observing (1) the inability of each eye to track movement smoothly, (2)

5   pronounced nystagmus at maximum deviation (90 degrees), and (3) onset of nystagmus at an angle less

6   than 45 degrees in relation to the center point, the officer can estimate whether the driver's blood

7   alcohol content exceeds the legal limit.  *United States v. Horn* notes that the three clues are performed

8   for each eye and if the officer observes four or more clues, then the NHTSA manual asserts that it is

9   likely that the suspect's BAC is above .10, and that by using this criteria one will be able to classify

10  correctly about 77% of suspects with respect to whether their blood alcohol level is above 0.10.  *Horn*,

11  185 F.Supp.2d at 537.

12          While there is debate whether a police officer's testimony that a defendant exhibited horizontal

13  gaze nystagmus is admissible at trial to prove that a defendant was under the influence of alcohol, *Horn*

14  states that the results of properly conducted standard field sobriety tests may be considered to determine

15  whether probable cause exists to charge a driver with driving while intoxicated.  *Horn,* 185 F.Supp.2d

16  at 534, *citing Ballard v. State*, 955 P.2d 931 (Alaska Ct.App. 1998); *State v. Superior Court (Blake)*,

17  718 P.2d 171, 173 (Ariz. 1986); *State v. Ito*, 978 P.2d 191(Hawaii App. 1999); *State v. Baue*, 607

18  N.W.2d 191, 197 (Neb. 2000).  *See also Strickland v. City of Dothan*, 399 F.Supp.2d 1275, 1287-88

19  (M.D. Ala. 2005).[3]

20

---

21          [3]Most courts hold that the HGN test is scientific in nature and is based on principles that are not

22  within the common understanding of lay persons.  *See United States v. Nguyen*, 2008 WL 540230 (E.D.
    Cal. 2008) *11.  As *Nguyen* notes, however, state court cases from across the country make clear that

23  the method for determining the presence of exaggerated nystagmus is not complex and such evidence is
    routinely introduced in trials under either the *Frye* or *Daubert* based state rules of evidence.  The courts

24  in these cases take judicial notice of the reliability of the HGN test as an indicator of intoxication and

25  therefore allow an officer to testify at trial regarding the results of the HGN test so long as he/she is
    properly trained to perform the test and the officer properly performed the test.  In *United States v.*

26  *Horn*, 185 F.Supp.2d 530 (D.Md. 2002), the scientific reliability of the field sobriety tests, including
    HGN, were extensively litigated by the presentation of expert testimony by both the defendant and the

27  government.  The court also reviewed all of the federal and state case law and literature cited therein
    regarding the reliability and admissibility of the field sobriety tests to prove alcohol impairment.  *Horn*

28

9

1    In *United States v. Stanton*, 501 F.3d at 1101, the Ninth Circuit rejected the defendant's

2  argument that the record did not support a finding of probable cause to arrest him for DUI.  The court

3  noted that in addition to the preliminary breath test result which the magistrate judge admitted at trial

4  only for purpose of establishing probable cause, the officer had observed defendant's watery and

5  bloodshot eyes, unsteady balance, slow speech and strong odor of alcohol and that he failed the walk

6  and turn and one leg stand tests.  The magistrate judge placed no weight on the HGN test because it was

7  conducted under less than ideal circumstances – defendant testified that while performing this test, he

8  was facing directly into the emergency lights and headlights of the officer's vehicle.  Likewise, it

9  appears that the Ninth Circuit gave no consideration to this test as supporting a finding of probable

10 cause.  The court found, however, that the other evidence was sufficient to establish probable cause to

11 arrest the defendant.

12    In this case, Officer Cranford received NHTSA certification in performing the field sobriety

13 tests in 1998.  He also attended both the Winston-Salem and Metro police academies in which he stated

14 he also received training in conducting DUI investigations and arrests.  Officer Cranford has conducted

15 many DUI investigations and arrests and performed the field sobriety tests on numerous occasions prior

16 to Defendant's stop and arrest.  During the hearing, Defendant's counsel attempted to challenge Officer

17 Cranford's knowledge of the requirements for performing the field sobriety tests based, in part, on the

18 fact that his NHTSA training course took place in 1998 and he has not been re-certified since that time.

19 Based on the Court's review of the case law and literature regarding the field sobriety tests as discussed

20 in *United States v. Horn*, Officer Cranford actually appears to have a generally good knowledge and

21 appreciation of the requirements of the tests from the standpoint of a police officer trained to perform

22 these tests.  Officer Cranford recognized that the HGN test has a scientific basis which the walk and

23 turn test and the one leg standing test do not and that the HGN test is, therefore, a more objective

24

25  ────────────────────

26 ultimately concluded that the HGN test is of sufficiently established reliability that the court may take
   judicial notice of its reliability and admit officer testimony regarding the performance of the test as

27 circumstantial evidence that a defendant is impaired by alcohol.  The court held, however, that the test
   is not sufficiently reliable to justify its admission at trial as direct evidence of intoxication or to prove

28 that a defendant had a specific blood alcohol content.

1  finding and less prone to subjective evaluation than the other field sobriety tests.  He also appreciated

2  that the HGN test is given more weight in assessing impairment than the other tests.  He testified,

3  however, that a determination of probable cause to arrest a suspect for DUI is based on the totality of

4  the circumstances, including other information that the officer has obtained during the investigation,

5  such as odor of alcohol, bloodshot eyes, admissions of alcohol consumption, etc.  While he testified that

6  results of the HGN test and his prior observations of Defendant provided probable cause to believe he

7  was under the influence of alcohol, he also performed the other tests and the preliminary breath test

8  before he placed Defendant under arrest.  *United States v. Stanton* indicates that a PBT test may be one

9  factor in establishing probable cause.  The results of these tests were also consistent with Officer

10  Cranford's conclusion based on the HGN test that there was probable cause to believe that Defendant

11  was under the influence of alcohol.

12       Officer Cranford's description of how he performed the HGN test and the other field sobriety

13  tests appear to have been consistent with the requirements of the tests.  A police officer is not required

14  to use a protractor or other specific measuring device to verify the onset of horizontal nystagmus before

15  45 degrees and distinct nystagmus at 90 degrees.  A competent police officer should be able to

16  determine these angles visually without a measuring device.  The chief concern with the reliability of

17  the field sobriety tests in this case is the short time frame in which they were conducted.  The stop

18  began at 6:05 and Defendant was placed under arrest at 6:15 a.m.  Given that Officer Cranford initially

19  spoke with Defendant for at least a few minutes before asking him to exit his vehicle, the time it took

20  for Officer Cranford to perform the three field sobriety tests, plus a preliminary breath test was less than

21  10 minutes, and probably in the range of 5-6 minutes.  Officer Cranford testified that based on his

22  experience in handling numerous DUI arrests, he is probably able conduct the tests in a shorter time

23  frame than a newly trained officer.  Officer Cranford testified that this was sufficient time for him to

24  conduct the three parts of the field sobriety test.  As Defendant's counsel noted, however, a certain

25  amount of "built-in" time is required to conduct the tests, including giving the driver the appropriate

26  instructions and observing his actions.  The Court has not been provided with or found case law or

27  other authority indicating that a competent police officer cannot adequately perform the tests within 5-6

28  minutes.  The Court, therefore, cannot state that it would not have been possible for Officer Cranford to

1   reasonably perform all three parts of the field sobriety tests, including giving the driver the appropriate

2   instructions, within the space of 5-6 minutes.

3          The Court finds that Officer Cranford was competent, both by training and experience, to

4   perform the field sobriety tests and that he properly performed the tests on the Defendant.  The Court

5   therefore concludes that Officer Cranford had probable cause to arrest Defendant for DUI based on the

6   results of the field sobriety tests, the preliminary breath test, and the officer's other observations,

7   including the odor of alcoholic beverage on Defendant, his bloodshot eyes, that Defendant had been

8   speeding 15 to 18 mph over the speed limit and that defendant traveled a half mile after the officer

9   signaled him to stop.  In addition, Defendant admitted drinking two or three beers and advised the

10  officer that he had been on the Las Vegas Strip for several hours before the stop.  The totality of these

11  circumstances were sufficient to provide probable cause to arrest Defendant for being under the

12  influence of intoxicating liquor.

13          **2.      Whether Evidence Regarding Defendant's Identity May Be Suppressed If the
                       Officer Lacked Probable Cause to Arrest Him.**

14

15         Assuming that Officer Cranford lacked probable cause to arrest Defendant, the second issue is

16  whether evidence relating to Defendant's identity should be suppressed in a prosecution under 8 U.S.C.

17  § 1326.  Defendant argues that the Court should suppress all evidence obtained as a result of the

18  allegedly unconstitutional seizure, including evidence of Defendant's identity, fingerprints, statements,

19  his purported immigration file, and all observations of his presence in the United States.  Defendant

20  argues that this remedy will not prevent the Government from deporting him, but will act as a proper

21  deterrent for the officer's violation of Defendant's Fourth Amendment rights.  The Government states

22  that it will not use as evidence at trial Officer Cranford's reasons for Defendant's arrest or his

23  observations of Defendant in this country.  In addition, the Government does not intend to use the

24  fingerprints taken by the police at Defendant's state booking on the DUI and speeding charges.  The

25  Government will, however, introduce Defendant's immigration file, fingerprints taken by immigration

26  officers and Defendant's statements to immigration officers after he waived his *Miranda* rights.

27  *Government's Response (#20),* page 20.

28         The Government argues that under Ninth Circuit case law, even if Defendant's arrest violated

                                                    12

1    the Fourth Amendment, neither Defendant's identity or evidence used to prove his identity, other than

2    that obtained during an unlawful seizure and arrest, may be suppressed.  In *United States v. Guzman-*

3    *Bruno*, 27 F.3d 420 (9th Cir. 1994), immigration agents, who were suspicious that defendant might be

4    unlawfully present in the United States, patted him down, asked his name and where he was born, and

5    then arrested him.  Defendant was subsequently indicted under 8 U.S.C. § 1326.  The district court held

6    that defendant's seizure and arrest were illegal and suppressed defendant's statements to the

7    immigration agents, with the exception of his initial admission of his name, as the fruits of his unlawful

8    arrest.  The district court held, however, that under the independent source doctrine, records of

9    defendant's previous convictions and deportations were not suppressible.   In affirming defendant's

10   conviction, the court stated:

11                A defendant's identity need not be suppressed merely because it is
             discovered as the result of an illegal arrest or search. "[T]here is no
12           sanction to be applied when an illegal arrest only leads to discovery of the
             man's identity." *Hoonsilapa v. INS,* 575 F.2d 735, 738 (9th Cir.)
13           (*Hoonsilapa* ), *modified by,*586 F.2d 755 (9th Cir.1978). "The 'body' or
             identity of a defendant ... is never itself suppressible as a fruit of an
14           unlawful arrest." *INS v. Lopez-Mendoza,* 468 U.S. 1032, 1039, 104 S.Ct.
             3479, 3483, 82 L.Ed.2d 778 (1984); *see also United States v. Foppe,* 993
15           F.2d 1444, 1449 (9th Cir.) (suppression of incidental observations by
             police, such as appearance, would not have deterrent effect on unlawful
16           police activity), *cert. denied,*510 U.S. 1017, 114 S.Ct. 615, 126 L.Ed.2d
             579 (1993). These cases clearly foreclose Guzman-Bruno's attempt to
17           suppress the fact of his identity.

18   *Guzman-Bruno*, 27 F.3d at 421-422.

19        In *United States v. Parga-Rosas*, 238 F.3d 1209 (9th Cir. 2001), the defendant was illegally

20   seized and arrested, and then questioned in violation of his *Miranda rights*.  Defendant was

21   subsequently indicted under 8 U.S.C. § 1326.  Based on the illegal arrest and violation of defendant's

22   *Miranda* rights, the district court suppressed defendant's statements and also suppressed fingerprints

23   that were obtained shortly after his arrest and which were used by the immigration agents to determine

24   defendant's identity.  The court, however, did not suppress defendant's identity, or records of his prior

25   convictions and deportation.  After the court suppressed the foregoing evidence, a fingerprint exemplar

26   was taken from defendant which an examiner for the San Diego Police Department compared with the

27   Warrant of Deportation in defendant's immigration "A" file.   The district court admitted this

28   fingerprint evidence at trial on the ground that the fingerprints were inextricably intertwined with

1   defendant's identity.  In affirming, the Ninth Circuit  stated: "Because the fingerprints were not taken

2   for investigatory purposes, but solely for the purpose of proving Parga-Rosas's identity, the Fourth

3   Amendment is not implicated.  *United States v. Guzman-Bruno*, 27 F.3d 420 (9th Cir. 1994) (identify of

4   the defendant admissible even if statements were not)."  *Parga-Rosas*, 238 F.3d at 1215.

5           In *United States v. Del Toro Gudino*, 376 F.3d 997 (9th Cir. 2004), an officer detained and

6   questioned defendant because he appeared to be a Hispanic transient and the officer suspected that he

7   might be unlawfully present in the United States.  The officer contacted the Border Patrol who

8   interviewed the defendant.  Although defendant provided untrue information regarding his identity, the

9   Border Patrol discovered his true identity when his fingerprints and photograph were matched to a

10  deported alien identified in immigration records.  Defendant was subsequently indicted under 8 U.S.C.

11  § 1326.  The district court denied defendant's motion to suppress without conducting an evidentiary

12  hearing on the grounds that defendant's identity could never be suppressed.  Although the Ninth Circuit

13  declined to rule on whether defendant's seizure violated his Fourth Amendment rights, since the district

14  court conducted no evidentiary hearing and made no findings of fact, the court expressed doubt the

15  defendant was detained solely because he was Hispanic.  *Del Toro Gudino*, 376 F.3d at 999 n. 5.  In

16  holding that the district court correctly denied defendant's motion to suppress, however, the Ninth

17  Circuit again relied on the Supreme Court's decision in *INS v. Lopez-Mendoza,* 468 U.S. 1032, 1039,

18  104 S.Ct. 3479, 3483, 82 L.Ed.2d 778 (1984) as follows:

19              The Court said two things in *Lopez-Mendoza* that are relevant to this
            appeal.  First, it held that the body or identity of a respondent in a
20          criminal or civil proceeding is not suppressible.  Lopez-Mendoza
            objected only to his having been brought before the INS, unlike
21          Sandoval-Sanchez, who challenged the evidence of his admission of
            unlawful entry.  The Court rejected Lopez-Mendoza's argument on the
22          grounds that "[t]he 'body' or identity of a defendant or respondent in a
            criminal or civil proceeding is never itself suppressible as a fruit of an
23          unlawful arrest, even if it is conceded that an unlawful arrest, search or
            interrogation occurred.  It is this extraordinarily broad statement, using
24          the rarely employed word "never," that underlies the district court
            decision in the case at bar.
25
                Second, the *Lopez-Mendoza* court held that the cases before it did not
26          involve "egregious" violations of the respondents' rights. . . .

27  *Del Toro Gudino*, 376 F.3d at 1000.

28          The defendant in *Del Toro Gudino* argued that the officer's alleged conduct in detaining him

                                                    14

1 solely because he was Hispanic was the type of egregious violation of his constitutional rights that

2 supported the suppression of his identity.  The court held, however, that under *Lopez-Mendoza,* even an

3 egregious constitutional violation would not support the suppression of a defendant's identity.  The

4 court stated that under *Lopez-Mendoza* identity evidence is inherently different from other kinds of

5 evidence.  "[T]he simple fact of who a defendant is cannot be excluded, regardless of the nature of the

6 violation leading to his identity." *Id.,* 376 F.3d at 1001.  The court further stated:

> Although the rule that identity evidence is not suppressible is not limited
> to § 1326 cases, its practical force is particularly great in this context.  If a
> defendant's identity may be suppressed, the moment the court lets him
> go, he is immediately committing the continuing violation of being
> present in the United States after having been deported.  This is the
> problem the Court found compelling in *Lopez-Mendoza,* when it noted
> that "[t]he constable's blunder may allow the criminal to go free, but we
> have never suggested that it allows the criminal to continue in the
> commission of an ongoing crime.

12 *Del Toro Gudino,* 376 F.3d at 1001-02.

13      In *United States v. Ortiz-Hernandez,* 427 F.3d 567 (9th Cir. 2005), *rehearing and rehearing en*

14 *banc denied by* 441 F.3d 567 (9th Cir. 2006), *cert. denied* 127 S.Ct. 358, 166 L.Ed.2d 132 (2006), the

15 defendant was arrested without probable cause on suspicion of drug dealing.  Following his arrest,

16 defendant was taken to the police station where the officer ran the name and date of birth he had given

17 through the "local system" and the National Crime Information Center without result.  The officer then

18 arranged for defendant to be interviewed on the telephone by an INS agent.  That interview produced no

19 incriminating information.  The detective then arranged for defendant to be fingerprinted.  The

20 fingerprints were then run through the Automated Fingerprint System which identified defendant by his

21 true name.  The officer was then able to determine that defendant had a prior criminal record and had

22 previously been deported.  The defendant was thereafter indicted under 8 U.S.C. § 1326.  The district

23 court held that defendant's arrest was not supported by probable cause and held that evidence of

24 defendant's fingerprints which were taken by the police officer for investigatory purposes to determine

25 his identity should be suppressed.  The district court also denied the government's motion to compel the

26 defendant to provide another set of fingerprint exemplars to confirm his identity for purposes of trial.

27 The district court denied this motion on the ground that defendant's arrest was an "'egregious' race-

28 based violation of the Fourth Amendment and suppressed all identification evidence taken following

1    the arrest." *Id.,* 427 F.3d at 576.

2           On appeal, the majority of the panel affirmed the district court's order suppressing the

3    fingerprint evidence that the government obtained during its investigation to determine defendant's

4    identity.  In this regard, the court followed *Hayes v. Florida,* 470 U.S. 811, 105 S.Ct. 1643 (1985) and

5    *Davis v. Mississippi*, 394 U.S. 721, 89 S.Ct. 1394 (1969), which held that fingerprints obtained for

6    investigative purposes as a result of an illegal arrest are subject to suppression.  The court, however,

7    reversed the district court's denial of the government's motion to require defendant to provide new

8    fingerprint exemplars.  The court cited its decision in  *Del Toro Gudino* that defendant's identity cannot

9    be suppressed even if it was obtained as a result of an egregious constitutional violation.  The court

10   further stated:

11              While the original set of Ortiz-Hernandez's fingerprints should be
              suppressed as wrongfully obtained, the government is now aware of
12            Ortiz-Hernandez's identity; it may rely on his identity as well as his
              criminal and immigration record, in bringing § 1326 charges against him.
13            *See United States v. Guzman-Bruno*, 27 F.3d 420, 422 (9ᵗʰ Cir. 1994)
              (affirming the district court's conclusion that neither the defendant's
14            "identity nor the records of his previous convictions and deportations
              could be suppressed as a result of the illegal arrest"); *accord United*
15            *States v. Roque-Villanueva,* 175 F.3d 345, 346 (5ᵗʰ Cir. 1999) (affirming
              the district court and refusing to suppress evidence of identity obtained in
16            an illegal traffic stop, concluding that "[e]ven if the [d]efendant was
              illegally stopped, neither his identity nor his INS file are suppressible").
17            As we have previously articulated, "there is no sanction to be applied
              when an illegal arrest only leads to discovery of the man's identity and
18            that merely leads to the official file or other independent evidence" being
              brought before the court.  *Guzman-Bruno*, 27 F.3d at 422 (internal
19            quotation and citation omitted.)

20   *Ortiz-Hernandez*, 427 F.3d at 577.

21          The court therefore held that the government could bring defendant to trial on the illegal reentry

22   indictment and compel him to submit to another fingerprinting based on that arrest and arraignment and

23   use that fingerprint evidence for purposes of identification at trial.  *Id.*  The court stated that this

24   decision was consistent with its decisions in *United States v. Parga-Rosas*, 238 F.3d 1209 (9ᵗʰ Cir.

25   2001) and *United States v. Garcia-Beltran*, 389 F.3d 864 (9ᵗʰ Cir. 2004).

26          The dissent in *Ortiz-Hernandez* argued that the majority had misread *Lopez-Mendoza* in holding

27   that the government could obtain and use new fingerprint exemplars to prove defendant's identity at

28   trial where the government had not demonstrated that it obtained evidence of defendant's identity other

16

than through the illegal arrest and seizure.  The dissent also relied on *Hayes v. Florida,* 470 U.S. 811, 105 S.Ct. 1643, 84 L.Ed.2d 705 (1985) and *Davis v. Mississippi*, 394 U.S. 721, 89 S.Ct. 1394, 22 L.Ed.2d 676 (1969), that fingerprints taken for investigatory purposes must be suppressed if they result from an illegal seizure or arrest.  The dissent also relied on the "fruits of the poisonous tree" doctrine in *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963), that not only evidence obtained in direct violation of the Fourth Amendment, but also evidence "come at by exploitation of the illegality" must be suppressed unless the taint of the illegality is sufficiently attenuated.  The dissent cited the Eighth Circuit's decision in *United States v. Guevara-Martinez,* 262 F.3d 751 (8th Cir. 2001), and district court decisions which follow that decision, in arguing that *Lopez-Mendoza* should be limited to the jurisdictional rule that a defendant does not have a valid objection to being produced in court as a result of an illegal seizure or arrest.  These courts hold, however, that *Lopez-Mendoza* does not apply to the evidentiary issue of whether evidence of identity should be suppressed, even in a § 1326 prosecution, where it was obtained as a result of an illegal seizure or arrest.  The dissent argued that the Fourth Amendment and the exclusionary rule would be rendered meaningless if the government is allowed to obtain and use another set of fingerprints from the defendant where it could not show that it obtained defendant's identity through any means independent of the original illegality.  The dissent also argued that the nature of a § 1326 prosecution or *Lopez-Mendoza* did not require such a result.  The dissent noted that while defendant's unlawful reentry requires his deportation, it does not require elimination of the exclusionary rule.[4]

In *United States v. Garcia-Beltran*, 389 F.3d 864 (9th Cir. 2004)*,* which preceded *Ortiz-Hernandez*, the court remanded the case back to the district court for an evidentiary hearing to determine whether fingerprint exemplars that were obtained after defendant's arrest were obtained for investigatory purposes or merely for identification purposes.  Both the majority and dissenting opinions in *Ortiz-Hernandez* argued that *Garcia-Beltran* was consistent with their positions.  On remand, the district court in *Garcia-Beltran* conducted an evidentiary hearing and determined that fingerprint

---

[4]The dissenting judges in *United States v. Ortiz-Hernandez*, 441 F.3d 1061 (9th Cir. 2006), adopted these same arguments in disagreeing with the orders denying defendant's petition for rehearing and petition for en banc review.

17

1   exemplars obtained after defendant's arrest were obtained for both investigative and identification

2   purposes and therefore ordered that they be suppressed.  The district court, however, also granted the

3   government's motion to compel defendant to provide a new set of fingerprint exemplars for use at trial.

4   *See United States v. Garcia-Beltran,* 443 F.3d 1126, 1128 (9th Cir. 2006), *cert. denied* 127 S.Ct. 319,

5   166 L.Ed.2d 239 (2006) (referred to herein as *"Garcia-Beltran II"*).  Relying on its previous decisions

6   in *Parga-Rosas* and *Ortiz-Hernandez*, the court in *Garcia-Beltran II* affirmed the district court's order

7   that the government could obtain new fingerprint exemplars to prove defendant's identity at trial.

8        *Garcia-Beltran II* also discussed the Eighth Circuit's decision in *United States v. Guevara-*

9   *Martinez,* 262 F.3d 751 (8th Cir. 2001), and district court decisions from other circuits which hold that

10  *Lopez-Mendoza* does not apply to the suppression of identity evidence in a criminal prosecution which

11  has been obtained as a result of an illegal seizure or arrest.  *See United States v. Olivares-Rangel*, 324

12  F.Supp.2d 1281, 1224 (D.N.M. 2004) (excluding all statements and fingerprints seized from defendant

13  as well as immigration and criminal records in the prosecution against defendant); *United States v.*

14  *Juarez-Torres*, 441 F.Supp.2d 1108, (D.N.M. 2006) (also suppressing all evidence that was obtained as

15  a result of the initial wrongful seizure and arrest).  *Garcia-Beltran II* noted, however, that the Ninth

16  Circuit's interpretation of *Lopez-Mendoza* is consistent with that of the Fifth Circuit in *United States v.*

17  *Roque-Villaneuva*, 175 F.3d 345, 346 (5th Cir. 1999).   After again reviewing its previous decisions, the

18  Court held that the government could obtain and introduce fingerprint exemplars for purposes of

19  proving the defendant's identity at trial.

20       Defendant's argument in this case is essentially the same as that of the dissenting judges in

21  *United States v. Ortiz-Hernandez*, *supra.*  There clearly is disagreement within the Ninth Circuit, and

22  between the Ninth and Eighth Circuit, regarding the interpretation of *Lopez-Mendoza.  Ortiz-Hernandez*

23  and *Garcia-Beltran II* hold, however, that defendant's identity may not be suppressed in a criminal

24  prosecution under 8 U.S.C. § 1326 and that even if defendant's identity is obtained as a result of an

25  illegal arrest, once that identity is known the government is not precluded from obtaining additional

26  evidence, such as fingerprints to prove his identity at trial.  Nor is the Government precluded from

27  using the information in defendant's immigration file regarding prior convictions and deportations to

28  obtain a conviction under 8 U.S.C. § 1326.  Defendant's argument that such evidence should be

18

1  suppressed, therefore, will require the Ninth Circuit to overrule the positions taken in *Ortiz-Hernandez*

2  and *Garcia-Beltran II* and the prior decisions on which they rely or obtain review by the United States

3  Supreme Court as to whether the Ninth Circuit's interpretation of *Lopez-Mendoza* is correct.

### CONCLUSION

5        The Court finds in this case that Officer Cranford had probable cause to arrest Defendant

6  Hernandez-Gomez for driving under the influence of alcohol in violation of NRS 484.379.

7  Accordingly, the evidence that the Government obtained regarding Defendant's identity was not the

8  product of an illegal search and seizure and does not warrant suppression of evidence relating to

9  Defendant's identity or his alleged unlawful entry into the United States.  This case, therefore, is not a

10  proper vehicle for obtaining a reversal of the Ninth Circuit's decisions which hold that where the

11  Defendant has been identified as a result of an illegal seizure and arrest, the Government is not

12  precluded from introducing evidence regarding his identity in a prosecution under 8 U.S.C. § 1326, so

13  long as that evidence was not itself obtained for investigative purposes which led to the Government's

14  identification of the defendant.  If the Court were to find, however, that Officer Cranford lacked

15  probable cause to arrest Defendant Hernandez-Gomez, then under existing Ninth Circuit precedent, the

16  Government is not precluded from introducing at trial Defendant's immigration file, fingerprints taken

17  by immigration officers after Defendant had already been identified and Defendant's statements to

18  immigration officers after he waived his *Miranda* rights.  Accordingly,

### RECOMMENDATION

20        **IT IS RECOMMENDED** that Defendant's Hernandez-Gomez's Motion to Suppress Evidence

21  (#18) be **denied.**

### NOTICE

23        Pursuant to Local Rule IB 3-2, any objection to this Finding and Recommendation must be in

24  writing and filed with the Clerk of the Court within ten (10) days.  The Supreme Court has held that the

25  courts of appeal may determine that an appeal has been waived due to the failure to file objections

26  within the specified time. *Thomas v. Arn*, 474 U.S. 140, 142 (1985).  This circuit has also held that (1)

27  failure to file objections within the specified time and (2) failure to properly address and brief the

28  objectionable issues waives the right to appeal the District Court's order and/or appeal factual issues

from the order of the District Court. *Martinez v. Ylst,* 951 F.2d 1153, 1157 (9th Cir. 1991); *Britt v. Simi Valley United Sch. Dist.*, 708 F.2d 452, 454 (9th Cir. 1983).

DATED this 25th day of March, 2008.

*George Foley Jr.*

GEORGE FOLEY, JR.
United States Magistrate Judge

20